## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

STEVEN NEUMANN,             )
                           )
      Plaintiff,           )
                           )
v.                         )    Case No.: 3:15-cv-00076
                           )
VILLAGE OF POCAHONTAS,    )
ILLINOIS, MICHAEL LANTRIP, both  )
individually and in his official capacity,  )
JANE LANTRIP, both individually and in  )
her official capacity,             )
                           )
      Defendants.       )

### RESPONSE TO DEFENDANTS'
### MOTION FOR SUMMARY JUDGMENT

NOW COMES Plaintiff, STEVEN NEUMANN, through his attorneys, Sorling Northrup,

Stephen F. Hedinger of counsel, and for his response to the Defendants' Motion for Summary

Judgment (Doc. #39) and the Memorandum in Support of Motion for Summary Judgment (Doc.

#40)(hereinafter "Memorandum in Support"), states as follows:

### I. FACTS

In order to address deficiencies in Defendants' statement of facts, Plaintiff below first

reiterates the Facts as stated in Plaintiff's own memorandum in support of motion for summary

judgment (Doc. #44), then identifies facts stated by Defendants which are not material and/or are

disputed, and finally includes additional facts that were not included within Plaintiff's motion for

summary judgment but which are relevant to issues raised by Defendants' motion.[1]

---

[1] The only transcript of a deposition taken in this case that has not been attached as an exhibit to either
Plaintiff's or Defendants' summary judgment motions is that of Lauren Malmberg; it is attached hereto as
Exhibit 2.  Attached as Exhibit 1 is Plaintiff's List of Exhibits to Summary Judgment Motions, which
identifies where each of the exhibits are located in the two motions for summary judgment.

## A. Plaintiff's Statement of Facts

In January 2014, Plaintiff was the owner of three dogs. Ruger was the first dog Plaintiff had purchased, and was approximately 7 years old at the time. Plaintiff also owned Trixie, and the union of Ruger and Trixie had produced Plaintiff's third dog, Mr. Sniffers. (Neumann dep., at 15-16).

On Saturday, January 25, 2014, Plaintiff left his home in Pocahontas, Illinois, to attend a demolition derby in Sturgis, Kentucky. He left his dogs in their fenced pen next to his house, and asked a neighbor to look after them. (Neumann dep., at 20-21).

Plaintiff's house was located approximately one block south of a house owned by Adam Evans (Evans dep., at 14-16, 22), who is, and at the time was, a trustee on the Board of Trustees for the Village of Pocahontas (Evans dep., at 7-8). Evans, in turn, lived immediately north of his mother, and in between his home and his mother's was a shed approximately 12 feet wide which extended toward the east about 20 feet deep; a 12 foot garage door opening was on the western side. (Evans dep., at 14-16). The garage door for the opening apparently worked (Evans dep., at 36), but Evans' mother did not use it, and instead had simply attached a sheet or tarp of some sort that covered the entry. (Evans dep., at 9-10). Evans' mother also set cat food out on the adjoining patio, to feed both her own and local feral cats. (Evans dep., at 8; M. Lantrip dep., at 86-87). The shed itself was full of miscellaneous items being stored by Evans' mother, and so was full of boxes and other items, and was generally in a messy and disorganized condition. (Evans dep., at 10; M. Lantrip dep., at 87-88).

At approximately 10:00 a.m. on Sunday morning, January 26, 2014, a neighbor of Evans contacted him and reported that two of Plaintiff's dogs were loose and were running around near

Evans' mother's house. (Evans dep., at 13). Evans went to investigate and saw the two dogs running around in and out of the garage area. (Evans dep., at 17-19).

Evans did not approach the dogs, but instead called the Pocahontas Chief of Police, Gino Feazel. (Evans dep., at 18). Feazel was not at work that morning, but on behalf of Evans, Feazel contacted the Village of Pocahontas animal control officer, Michael Lantrip, and instructed him to attend to Plaintiff's loose dogs. (Feazel dep., at 74-75; M. Lantrip dep., at 85). Feazel also called the Bond County Sheriff's Department (Feazel dep., at 76; Clark dep., at 14). According to the dispatcher on duty at the time, Feazel instructed the sheriff's office to "send officer to Kavanaugh at Bond in Pocahontas. Neumann's pit bulls are out and destroying stuff at Adam Evans' mom house. They can be shot because they are mean." (Clark dep., at 15; Feazel Dep. Ex. 5).

The dispatcher contacted the Bond County deputy on duty, Jared Jolliff, and passed on the message from Feazel. (Clark dep., at 17). Feazel then called Jolliff directly, and warned Jolliff that Plaintiff's dogs were aggressive, and recommended that Jolliff take care in dealing with them. (Jolliff dep., at 10-11).

The Bond County dispatcher notes reflect that Feazel called for County deputy assistance at 10:07:12 a.m. on that morning. (Feazel Dep., Ex. 5).

After the Pocahontas animal control officer, Michael Lantrip, received Feazel's call, he informed his wife, Jane Lantrip, of the situation and asked if she would accompany him in case her help was needed, and she agreed (J. Lantrip dep., Ex. 1). The Lantrips then proceeded to Adam Evans' mother's garage where they met with Evans. (M. Lantrip dep., at 87-88). Michael Lantrip approached the garage, but since the tarp or sheet was covering the entranceway, no one could see inside to determine if the dogs were there. (M. Lantrip dep., at 89). Accordingly,

Michael lifted the cloth slightly to the side, revealing one of the dogs, and Jane Lantrip began calling to the dog and offering it food, trying to coax it out. (M. Lantrip dep., at 89-90; J. Lantrip dep., at 24).   Rather than coming to Jane Lantrip, though, that dog darted out and ran south toward Plaintiff's house. (Evans dep., at 21; M. Lantrip dep., at 90-91).

At that time, those present believed that both dogs had left, and Michael Lantrip and Jane Lantrip went to Plaintiff's house to tell him of his loose dogs; he wasn't home, so they returned to the shed. (M. Lantrip dep., at 91). Adam Evans then approached the shed to determine if any damage had been done while the dogs were in there. (Evans dep., at 21).   When he pulled back the curtain, though, he saw that Ruger was back in the far northeastern corner of the shed, and from there he growled at Evans. (Evans dep., at 21; M. Lantrip dep., at 91-92).   Evans returned to his car. (M. Lantrip dep., at 93).

Michael Lantrip spent several minutes attempting to snare Ruger using the old, homemade catchpole that had been provided to him for animal control purposes; his efforts were unsuccessful, though, and after a short period of time he gave up. (M. Lantrip dep., at 93-94). They and Evans then just waited in the alley until Deputy Jolliff arrived; Michael Lantrip said that after he backed off, Ruger calmed down and retreated to the very back of the shed. (M. Lantrip, at 93-94).   According to the dispatch records, Jolliff reported arriving in Pocahontas at 10:23:09 a.m. (Feazel Dep. Ex. 5).

Deputy Jolliff first went directly to Plaintiff's house, but by that time the dog that had left the shed was back at Plaintiff's house and sat on the porch and would not allow Jolliff to get to the porch. (Jolliff dep., at 12-14).   Plaintiff's truck was in the driveway, leading Jolliff to believe Plaintiff was at home, so he sounded his air horn in an effort to get Plaintiff's attention. (Jolliff dep., at 15). When Plaintiff did not come out, though, Jolliff went to the shed, where the others

were still gathered. (Jolliff dep, at 15).   Jolliff discussed the situation briefly with Michael Lantrip, and then Michael Lantrip made one more unsuccessful effort to use the catchpole, but Ruger wouldn't cooperate and allow the loop to go over his head. (M. Lantrip dep., at 97). Those present could think of no other ways to capture Ruger, and because he was growling at them, they decided to shoot him. (M. Lantrip dep., at 97). Jolliff did not want to use his own weapons, which were of relatively high caliber, but Michael Lantrip had brought with him a .22 rifle, and he and Jolliff agreed that that gun should be used to shoot Ruger. (M. Lantrip dep., at 97-98). Jolliff did not want to shoot Ruger and upon his insistence, Michael Lantrip agreed to do so. (M. Lantrip dep., at 97-98; Jolliff dep., at 22-24).

Ruger was still in the far back corner of the shed.   According to all present, when he was approached Ruger growled, his hair was raised, and he was hunched up.  (M. Lantrip dep., at 91-93, 98; Jolliff dep., at 51-52; Evans dep., at 44, 48). Each person involved also reported, though, that at no time had Ruger bitten or attempted to bite anyone present or even to bother Evans' mother's cats. (Evans dep., at 47; M. Lantrip dep., at 108; Jolliff dep., at 51-52).   Instead, all reports of Ruger's aggressiveness were based exclusively upon his growling, raised hackles and standing fur.

Michael Lantrip walked into the shed and approached Ruger, moved some boxes in front of Ruger to get a clean shot, and then shot Ruger twice in the head, killing him. (M. Lantrip dep., at 98).

The dispatch notes reveal that Deputy Jolliff cleared the scene at 10:36:15 a.m. (Feazel Dep. Ex. 5).

Plaintiff returned home from his out-of-state trip at approximately noon, barely an hour and a half after Ruger had been shot. (Neumann dep., at 48).

### B.  Immaterial and/or Disputed Facts

The following assertions from the "Facts" set forth in the Memorandum in Support are either

not material or are disputed by Plaintiff, or both, for the stated reasons:

First, Defendant states that all three of Plaintiff's "dogs, however, got out of the yard as was

a frequent occurrence." (Memorandum in Support, at 1). Defendants continue by asserting that

Adam Evans (a Pocahontas village board member) had previous "run ins with these dogs,"

(Memorandum in Support, at 2). Plaintiff disputes the assertion that all three dogs were out of the

enclosure on January 26, 2014because as noted above, only two got out. Plaintiff also disputes

the characterization that the escape from Neumann's yard by all three, or even any, of the dogs

was "a frequent occurrence." To the contrary, Brian Handegan, who had served as the

Pocahontas animal control officer for four or five years immediately preceding the tenure of

Michael Lantrip (Handegan dep., at 11, 42 – 43, 47), testified that Plaintiff's dogs had escaped

only twice in all of his experience (a record which was the same as the "at large" history of the

mayor's dogs!). (Handegan dep., at 50 – 53). Further, the characterization that the "occurrence"

was "frequent" is not material – Defendants do  not, and cannot, assert that the frequency of a

dog getting loose means its owner has any fewer or different rights with respect to how the dog is

treated by the government. (Malmberg dep., at 63 – 64).Plaintiff similarly disputes Defendants'

claim that Adam Evans had previous "run ins" with the three dogs – in fact, Evans only claims to

have had a "run in" with one of the dogs, and he never identified which one is was (Evans dep.,

at 28). In any event, his past experience is immaterial, since  he didn't tell either Michael Lantrip

or Deputy Jolliff (the two who made and acted upon the decision to shoot Ruger) about his

alleged past experience with one of Plaintiff's dogs (Evans dep., at 51).

Defendants assert that Michael Lantrip and Jane Lantrip were en route to the store, "[s]ince it was a Sunday morning," when Michael was called to respond to the loose dog in Adam Evans' mother's garage. The assertion that the Lantrips were headed to the store does not appear to be material to any issue in this case; to the extent Defendants are attempting to suggest that Jane Lantrip just happened to be present because she was already with Michael on their way to the store, this is a fabrication and is accordingly disputed by Plaintiff – the facts, as admitted by both Lantrips, are that Michael received the call before they had left for the store, and Jane accompanied him in case her assistance was needed, and to expedite the process so they could get to the store sooner. (see discussion above).

Plaintiff disputes the Defendants' characterization that the Bond County sheriff's office was called only after Michael Lantrip had tried unsuccessfully to capture the dog. The facts instead are that Adam Evans called chief of police Gino Feazel (Lantrip's direct supervisor) about the loose dogs; Feazel never went to the scene and never saw the dogs, but instead he called Lantrip and instructed him to take care of the situation, and then he called the county dispatcher to have an officer sent to the scene, specifically advising that both of the dogs could "be shot because they are mean." Not satisfied with this, Chief Feazel then called deputy Jolliff directly (Jolliff is Feazel's good friend – they race demolition derby cars together, and they and their wives often socialize – Feazel dep., at 25 – 26), and Feazel warned him that the dogs were aggressive. (See discussion above).

Defendants next assert that only "[a]fter discussions with Lantrip and further attempts to snare the dog" did deputy Jolliff make "the decision that the dog needed to be put down." (Memorandum in Support, at 2). To the extent this suggests that Jolliff assisted Lantrip with attempts to capture the dog, it is pure fancy – Jolliff never went into the shed, and never got close

to the dog. (Jolliff dep., at 20, 25). Further, the suggestion that Lantrip made "further attempts to snare the dog" is a mischaracterization – Lantrip made only a single additional attempt, and when that failed he decided that there was nothing else he know how to do to capture the dog, and it was based upon that information that Jolliff suggested that they should shoot Ruger. (M. Lantrip dep., at 104).

Defendants' characterization that Lantrip went ahead and killed Ruger "reluctantly" is immaterial – the undisputed fact is that, of his own free will, Lantrip shot Plaintiff's dog while conducting his official duties as the Village of Pocahontas animal control officer, and Defendants have not and cannot point to any law, regulation or policy allowing him to do so under these circumstances. Whether Lantrip was giddy with joy or somewhat reluctant is of no matter.

Finally, the last sentence of the Defendants' statement of the facts asserts that Lantrip "took the dog's body home, cleaned it up, and ultimately returned it to the plaintiff at plaintiff's request." (Memorandum in Support, at 2). This is mot material to any issue in the case, other than as an admission by Defendants that Ruger was, indeed, dead as a result of the brutal, unlawful and undeniably unnecessary actions of Lantrip.

## C. Plaintiff's Additional Facts

The following additional facts are material to the issues raised in Defendant's Motion for Summary Judgment and Memorandum in Support.

[Feazel disliked Neumann, and both Feazel and Jolliff competed against Neumann in derby racing. Both also did "business" with Neumann from time to time for derby cars or parts]

[Malmberg worked for 30 years and dealt with hundreds of thousands of animals but never had to shoot one, and said that virtually any dog could be captured with a catchpole of the operator knew how to use it. Training was available and was free]

[Lantrip had dead cats in the back of his pickup truck at the time Neumann recovered his dog, and admitted that he had killed other animals, including at least one cat, as a part of his official duties for Pocahontas]

[Lantrip admitted that alternatives to shooting existed, but he just didn't know about them before Jan. 26, 2014 – his vet advised pepper spray and an air horn, and he thereafter carried pepper spray that he had to purchase himself. Lantrip asked the Village for training and better facilities and equipment, and the mayor had suggested training to Handegan but never provided it.]

## II. JANE LANTRIP

Defendants begin their Memorandum in Support by stating that "ALL CLAIMS AGAINST JANE LANTRIP ARE FRIVOLOUS" (Memorandum in Support, at 3, emphasis from original). They claim that she was "simply accompanying her husband," and they the only case they cite is Johnson v. City of Evanston, 250 F.3d 560, 562-63 (7th Cir. 2001), for the proposition that Jane Lantrip was "a simple bystander who happened to be with her husband," and therefore that she was not acting "under of color of state law" and so cannot be liable to Plaintiff under the Civil Rights Act or any other theory of liability for the shooting death of Ruger. (Id.). Defendants also contend that she "took no action that resulted in the harm to the dog, and so cannot be found liable for its death. (Memorandum in Support, at 3).

Defendants' mischaracterize Jane Lantrip's role and intentions on January 26, 2014. In her written report, Jane stated that she went with her husband to respond to the loose dogs "in case he needed any help" (emphasis added). Moreover, she did indeed help – she has admitted that she actively attempted to capture at least one of the dogs by coaxing him out of the garage using as bait dog food she brought with her from her home, just for that purpose. Moreover, she has

also admitted that her experience with Ruger was not an isolated event – to the contrary, she regularly assisted Michael with his duties, to the point of turning their house into a boarding kennel for Village strays, and serving as the official Village caretaker of the animals left in tier care, in addition to assisting with numerous other calls to capture stray dogs. (See Plaintiff's Memorandum or Law in Support of Plaintiff's Motion for Summary Judgment, at 9 – 10).

The Seventh Circuit, and other courts, have recognized that a "private citizen may . . . become a public officer *pro tem*." Proffitt v. Ridgeway, 279 F.3d 503, 507 (7th Cir. 2002). The Proffitt court provides, as an example, a situation where "the police deputized a bunch of private citizens to help them enforce the law, and the deputizations were entirely informal, perhaps not even in accordance with state or local law. Nevertheless these 'deputies,' performing, as they would be, public functions, would be considered to be acting under color of law within the meaning of Section 1983." 279 F.3d at 507-08 (citations omitted). See also Payton v. Rush-Presbyterian-St. Luke's Medical Center, 184 F.3d 623, 627-630 (7th Cir. 1999); Del's Big Saver Foods, Inc. v. Carpenter Cook, Inc., 795 F.2d 1344, 1346 (7th Cir. 1986); Shelby Industrial Park, Inc. v. City of Shelbyville, 2008 WL 2018185 (S.D. Ind. May 9, 2008). In Fabrikant v. French, 691 F.3d 193, 206-211 (2d Cir. 2012), the court determined that an animal rescue organization that performed surgery on animals being kept from their owners by authority of the State were state actors for §1983 liability, and in doing so exhaustively considered a number of other circumstances in which those engaged in activities involving animals were considered state actors. Contrary to Defendants' characterization, she was not merely "a simple bystander," but she was a direct participant.

Defendants also fail to explain why Jane Lantrip's involvement is not sufficient to find her liable for Ruger's death – she actively participated in the action, as she did on other

occasions, and she actively assisted her husband Michael. Defendants provide no authority for the amount of active involvement which they believe must be present to establish or support liability on the theories advanced by Plaintiff, and Plaintiff is not in a position to assume or guess at what Defendants' arguments may be. Based purely upon the record before this Court, it is apparent that Jane Lantrip had at least enough involvement to raise a question for the jury's determination as to whether she can be held liable for the unwarranted shooting death of Ruger.

One final observation about this portion of Defendants' motion concerns their assertion that naming Jane Lantrip as a party warrants Rule 11 sanctions. Defendants assert that Plaintiff knew of Jane Lantrip's innocence based upon pre-trial Freedom of Information Act materials; however, those materials included Jane's written statement which admitted that she had attended "in case [Michael] needed any help," and admitted that she actively participated in the efforts to capture Plaintiff's dogs. At the very least this raised a colorable question of the depth of her involvement and strongly suggested that she was acting under color of state law, and in light of that pre-trial documentation, Defendants' assertion that Rule 11 sanctions should be considered is, stated most charitably, perplexing. In any event, though, Defendants do not appear to be sincere in their Rule 11 threat, because they have not complied with, and cannot claim that they have complied with, the requirements of Rule 11(c)(2), which requires that before a motion for sanctions may be filed with the court, the aggrieved party must first give the offending party at least 21 days to withdraw the bad pleading – here the first inkling Plaintiff had of Defendants' Rule 11 claim stated in the body of the Memorandum in Support. The Rule 11 assertion itself appears to be the frivolous pleading, not Plaintiff's complaint.

### III.   FOURTH AMENDMENT LIABILTY/QUALIFIED IMMUNITY

Defendants next argue that Michael Lantrip cannot be liable under Plaintiff's Fourth Amendment claim because his actions were objectively reasonable, or alternatively because he is entitled to qualified immunity. This argument lacks any merit; if anything, there is no genuine issue of material fact that Michael Lantrip's actions were objectively <u>unreasonable</u>, and that he is not entitled to qualified immunity, and judgment of liability should be entered against him on Plaintiff's Fourth Amendment claim.

Under the Fourth Amendment to the United States Constitution, the people are promised "to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. Amend. IV. "'Effects' means personal property. A 'seizure' of personal property occurs when 'there is some meaningful interference with an individual's possessory interests in that property.' [citations]. Destruction of personal property is such a 'meaningful interference,' as it changes a temporary deprivation into a permanent deprivation. The seizure of property is subject to Fourth Amendment scrutiny even if no search occurred." <u>Viilo v. City of Milwaukee</u>, 552 F. Supp. 2d 836-837 (E.D. Wis. 2008), aff'd and appeal dismissed, 547 F.3d 707 (7th Cir. 2008) (quoting <u>Soldal v. Cook County, Ill.</u>, 506 U.S. 56, 61 (1992) (other citations omitted).

Since at least 2008, the Seventh Circuit has recognized that "the killing of a companion dog constitutes a 'seizure' within the meaning of the Fourth Amendment." <u>Viilo</u>, 547 F.3d at 710 (citing <u>Altman v. City of High Point, NC</u>, 330 F.3d 194, 204-05 (4th Cir. 2003); <u>Brown v. Muhlenberg Twp.</u>, 269 F.3d 205, 210-11 (3d Cir. 2001); <u>Lesher v. Reed</u>, 12 F.3d 148, 150 (8th Cir. 1994); <u>Fuller v. Vines</u>, 36 F.3d 65, 68 (9th Cir. 1994), *overruled on other grounds by* <u>Robinson v. Solano County</u>, 278 F.3d 1007, 1013 (9th Cir. 2002)). <u>See</u> <u>also</u> <u>Siebert v. Severino</u>, 256 F.3d 648, 656 (7th Cir. 2001).

Plaintiff's complaint alleges that the shooting of Ruger constituted an illegal seizure of Plaintiff's property in violation of his Fourth Amendment rights.

Defendants begin by admitting and agreeing that "[a] dog is property that can be seized and the killing of a dog is recognized as a seizure under the Fourth Amendment." (Memorandum in Support, at 4, citing Pfeil v. Rogers, 757 F.2d 850, 866 (7th Cir. 1985)). Defendants, however, then inauspiciously allow their analysis to become hopelessly muddled and confused between Fourth Amendment illegal seizure claims (which is what Plaintiff has alleged) and Fifth Amendment claims for violation of a plaintiff's right to due process of law (which Plaintiff has not alleged). Inexplicably, Defendants state that the constitutional issue raised in this case is controlled by Zinermon v. Burch, 494 U.S. 113, 125 (1990), Mathews v. Eldridge, 424 U.S. 319, 334 (1976), and Brandon v. City of Maywood, 157 F.Supp. 2d 917, 931 (N.D. Ill. 2001) (Memorandum in Support, at 4 – 5), none of which was decided under the Fourth Amendment, but rather all of which were Fifth Amendment decisions.  Zinermon analyzed the complaint under review for necessary allegations to state a claim for deprivation of due process of law, and turned upon discussions of pre- and post-deprivation remedies under the applicable state law. 494 U.S. at 124-139.  Mathews v. Eldridge is of course the seminal Supreme Court case establishing the weighing process to determine the necessary process required by a given situation. The Zinermon Court, in fact, quoted the operative language of Mathews that discussed the various factors necessary "[t]o determine what procedural protections the Constitution requires in a particular case" in order to determine what process is due in a particular situation. Zinermon, 484 U.S. at 127, quoting Mathews, 424 U.S. at 334.  And although the third case cited by Defendants, Brandon, does include discussion of an alleged Fourth Amendment violation, Defendants' Memorandum in Support relies upon page 931 of that Brandon opinion, in which

the court considered one plaintiff's "claim for deprivation of property under the Due Process Clause of the Fourteenth Amendment based on the injuries to her dog from the shooting." 157 F.Supp. 2d at 930. That particular Brandon plaintiff did not plead the shooting as a Fourth Amendment violation.

Defendants' confusion about which constitutional amendment is under consideration is by itself reason to disregard their motion.

Equally inexplicable is Defendants' failure to cite to this court the most relevant and binding precedent regarding the shooting of pet animals. Under established precedent, Lantrip's "actions, therefore, were constitutional only if reasonable." Viilo, 547 F.3d at 710 (citing United States v. Place, 462 U.S. 696 (1983)), and the reasonableness of those action was defined eight years ago: ". . . [T]he use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable." 547 F.3d at 710 (citing Brown, 269 F.3d at 210-11) (emphasis added). Illinois law is in full accord; pursuant to the Animal Control Act, dogs found running at large, such as Ruger, are to be taken up and impounded by animal control authorities, not shot. 510 ILCS 5/9. Even dangerous dogs (510 ILCS 5/15.1) and vicious dogs (510 ILCS 5/15), are entitled to some process prior to being humanely euthanized. (A "dangerous dog" is defined as, among other things, "posing a serious and unjustified imminent threat of serious injury or death to a person or a companion animal - 510 ILCS 5/2.05a, and a "vicious" dog is one "that, without justification, attacks a person and causes serious injury or death," or a dog that has been found to be dangerous on three separate occasions - 510 ILCS 5/2.19b). Animal control officers are not even allowed to use firearms unless they have been trained in accordance with the Peace Officer Firearm Training Act (section 5 of the Animal Control Act, 510 ILCS 5/5) (Lantrip admits that he never received such training) (M. Lantrip

dep., at 66).

Strangely, although ignoring the clear and simple test for reasonableness provided by the Seventh Circuit, Defendants do rely upon a recent district court decision from Colorado, Branson v. Price, 2015 U.S. Dist. LEXIS 126652, 2015 WL 5562174 (D. Colo. Sept.21, 2015). If anything, though, that decision supports a ruling that the shooting was unreasonable – in Branson, both an animal control and several police officers were present at the scene of a dog running loose. One officer believed that not only was the dog acting extremely aggressively, it was actually charging at the officers, so that officer shot the dog. There was dispute and disagreement as to whether the dog actually posed an imminent danger to the officers, and the court held that the possibility that the dog was not an imminent threat required denial of the officer's motion for summary judgment that the shooting had been reasonable. Similarly, the Branson court reviewed current caselaw and determined that "the robust consensus of persuasive authority from other courts of appeal demonstrates that the defendant had fair notice, even in this novel factual circumstance, that using deadly force against a dog was unlawful when the dog did not present an imminent threat to law enforcement or the public." 2015 WL 5562174, slip op. at *7. The Branson court accordingly denied the defendants' request for qualified immunity.

Defendants' argument concerning the reasonableness of Lantrip's actions and the availability of qualified immunity turns largely upon Defendants' unwarranted spin upon the actual facts. Contrary to their assertion, here there was no imminent danger to anyone – each person present agreed that Ruger was calmed down when no one was approaching him, and he was located in the far back corner of the garage, where he couldn't escape. Ruger growled and raised his hackles, but all agreed that he never tried to bite anyone. Moreover, even Lantrip admitted that alternatives to shooting Ruger existed – after this incident, in fact, Lantrip began

carrying pepper spray just in case he was ever faced with a situation like this one. (M. Lantrip dep., at 79). Brian Handegan, who had direct firsthand experience with Ruger, testified that if Lantrip had just let the situation, and Ruger, calm down, Ruger probably would have come along peacefully and gently, just as he had done with Handegan. (Handegan dep., at 58 – 59) (in fact, notably Lantrip admitted that when he did what Handegan recommended – backed away and left Ruger alone – Ruger calmed down considerably – M. Lantrip dep., at 93 – 94). Moreover, it is undisputed that Lantrip had virtually no training in how to use the catchpole, yet it is also undisputed that, with proper training and experience (experience which was available as part of free training), virtually any dog can be safely and successfully captured by using a catchpole. (See Plaintiff's Memorandum in Response to Defendants' Daubert Motion to Exclude Expert Opinions and Testimony (Doc. # 49) (incorporated herein by reference).

Finally, Defendants claim a couple of times that for some reason Jolliff's participation renders Lantrip's involvement unimportant – they appear to claim that since Jolliff came up with the idea of shooting Ruger, only Jolliff has responsibility for the actual deed, even though it was Lantrip, not Jolliff, who pulled the trigger. Defendants apparently were unable to find any authority for their argument, because they cite none — Plaintiff is equally unaware of any doctrine or authority that would relieve a state actor from liability for his actions merely because he was advised to do the unconstitutional act by another state actor. (Not that it necessarily matters, but Defendants do not assert that Lantrip was under any threat of arrest or other negative repercussions had he chosen to disregard Jolliff's suggestion that he shoot Ruger, or that he use his own gun to do so).

To support their claim that Lantrip is entitled to qualified immunity, Defendants argue that the test for qualified immunity is whether the actions revealed that the officer "was plainly

incompetent or knowingly violated any law." (Memorandum in Support, at 6, citing Malley v. Briggs, 475 U.S. 335, 341 (986)). Defendants' analysis is completely off base.  The standard for the "qualified immunity" defense is not merely an assessment of whether the officer in question was "plainly incompetent" or "knowingly violated the law," and the Malley case never said it was. The precise language from Malley cited by Defendants as the "qualified immunity" standard is not, in fact, the standard -- the Court, rather, while discussing the evolution of "the qualified immunity defense" noted that the defense created by Harlow v. Fitzgerald, 457 U.S. 800 (1982), "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." 475 U.S. at 341.  This is not the elements of a qualified immunity defense, but rather merely a description of some of those who receive a benefit from application of the immunity.

Instead, the well-known concept of "qualified immunity" as applied to §1983 actions requires an equally well-known two-step consideration:  First, whether a constitutional violation occurred, and second, if so, whether the right that was violated was clearly established at the time of the officer's actions.  See Saucier v. Katz, 533 U.S. 194, 201 (2001); see also Viilo v. City of Milwaukee, 552 F.Supp 2d 836, 840 (E.D. Wis. 2008), aff'd and appeal dismissed, 547 F.3d 707 (7th Cir. 2008).  Contrary to Defendants' argument, it is not enough for Lantrip to have merely been incompetent (although clearly he was), or to have knowingly violated the law – instead, the test is whether a reasonable official would understand that what he was doing violated the property owner's rights. As Defendants' own authority, the Branson court, has noted, "the robust consensus of authority" clearly reveals that any reasonable officer would have known that shooting Ruger under the circumstances present was illegal.

Defendants add to their argument the weak assertion that officers are entitled to the benefit of the doubt where they are called upon to make split-second decisions. The Branson case also answers this argument – "[e]xigency is required to demonstrate a tense, rapidly evolving situation where allowance is given for the police to make split-second decisions." 2015 WL 5562174, slip op. at *6. The Branson court found no exigency existed there; neither did any exist here, where the humans gathered at their leisure outside the garage and leisurely decided that their chosen course of action was to shoot Ruger. There was no exigency, and Lantrip is not entitled to the benefit of that doubt.

In short, not only is there no basis to find in favor of Defendants on the issues of the reasonableness of Lantrip's actions or the availability of qualified immunity, but in fact there is more than ample basis to rule in Plaintiff's favor on those issues.

## V. *MONELL* CLAIM

Contrary to Defendants' argument, there is a strong basis for the Village of Pocahontas' liability in this case. Pursuant to Monell v. Dept. of Soc. Servs. of City of New York, 436 U.S. 658 (1978), municipalities are liable under 42 U.S.C. §1983 only for their own acts in violation of constitutional protections; typically this requires proof that the municipality's policies or customs were directly responsible for the violation. See Viilo, 552 F.Supp. 2d at 842-43. "Before the City can be liable under Section 1983, the plaintiff must show either (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policy making authority." Roach v. City of Evansville, 111 F.3d 544, 548 (7th Cir. 1997). In this case, the Village of Pocahontas is liable

both because of "a widespread practice" of failing to train its animal control officers, and because the constitutional injury to Plaintiff "was caused by a person with final policy making authority."

First, with regard to the "widespread" practice prong of liability, in City of Canton, Ohio v. Harris, 49 U.S. 378, 388 (1989), the Court held that "the inadequacy of police training may serve as the basis for §1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." Here the record is clear that the Village of Pocahontas provided virtually no training to any of its animal control officers. Brian Handegan, who served in that capacity prior to Michael Lantrip, stated that, although at one point the Village's Mayor suggested that training might be a good idea, none was ever provided to him (Handegan dep., at 34-35), and he felt that he was inadequately prepared for the job, and even needed more training after leaving the position after four or five years of service (Handegan dep., at 36; see also 14-15, 19). Michael Lantrip also admitted that he had received no training for his job. (M. Lantrip dep., at 64-67). The Village of Pocahontas didn't even instruct Lantrip about the appropriate use of force in doing his job! (M. Lantrip dep., at 66-67). Lantrip also admitted that, after he shot Ruger, he took it upon himself to obtain additional education in animal control work, and at his personal veterinarian's recommendation, thereafter started carrying pepper spray and an air horn with him during his official animal control duties as additional means of controlling animals. (M. Lantrip dep., at 79). The Village's Mayor, Karen Heilig, similarly admitted that the Village provided no training whatsoever to its animal control officers, and she also admitted that, following the shooting death of Ruger, the Village was considering its options for providing such training. (Heilig dep., at 17). Gino Feazel, the Village of Pocahontas Chief of Police, served as the immediate supervisor over the Village's animal

control officers (Heilig dep., at 13-14; Feazel dep., at 31; M. Lantrip dep., at 61-63), yet he admitted that he himself lacked any knowledge or education in animal control techniques (Feazel dep., at 17-18, 28-30); moreover, he also admitted ignorance of State laws and regulations pertaining to animal care and control, and instead looked only to the Village's Animal Control Ordinance. (Feazel dep., at 28-31). Michael Lantrip similarly admitted ignorance of the State laws or regulations pertaining to animal care and control. (M. Lantrip dep., at 111-112).

In its hiring decision for the position of animal control officer, the Village looked, at most, at whether an individual had his own dogs, or seemed to be "an animal person". (Feazel dep., at 37; Heilig dep., at 17). More importantly, though, it appears that the primary qualification for the job was to be a buddy of Chief Feazel – that's how both Michael Lantrip and his successor obtained the position. (Heilig dep., at 17-18, 25).

In addition to failing to provide any training, the Village also failed to provide the equipment necessary to do the job.  The only materials provided were an old, homemade catch pole, a pair of gloves that both Handegan and Lantrip declared as worthless, a badge, metal sign for the animal control officer's personal vehicle (identifying him as the Village's animal control officer), and some live traps.  Upon learning the utility of pepper spray, Michael Lantrip had to purchase his own. (Heileg dep., at 20-22; M. Lantrip dep., at 79).  The Village of Pocahontas rejected M. Lantrip's requests to construct the Village's own animal control facility. (M. Lantrip dep., at 48-49).

The record is undisputed that the Village of Pocahontas required the services of an animal control officer for at least the past eight years, and that officer was expected to perform official duties for at least 30 or 40 hours per month. (Heilig dep., at 11-12; M. Lantrip dep., at 51; Handegan dep., at 13). That resulted in a significant number of contacts between the animal

control officer and animals within the Village, and the failure of the Village to train its animal control officers in animal control techniques, and to educate its officers on the same and on the laws pertaining to their behavior, can be viewed as nothing but deliberate indifference to the rights of the Village residents with respect to their property.

The record equally supports <u>Monell</u> liability because Ruger's unconstitutional death was directly caused by a person with final municipal policy making authority. (See deps of M. Lantrip, Feazel, Heilig, Handegan, Joliff, and Clark). Police chief Feazel was the immediate supervisor over Michael Lantrip (in fact, chief Feazel was instrumental in having Lantrip hired, and Feazel and Lantrip were good friends). Moreover, Feazel and deputy Jolliff were demolition derby car allies, and both of them competed against Plaintiff in the demolition derby circuit, and both occasionally traded (or attempted to trade) with Plaintiff with demolition derby cars or parts (through that contact, both knew Plaintiff's dogs, including Ruger, very well).. Both Plaintiff and an unbiased observer, Brian Handegan, noted that Feazel exhibited a clear dislike for Neumann.

Against this background the overlay of Feazel's statement to the Bond County sheriff's department dispatcher, Karen Clark, takes full meaning: ""send officer to Kavanaugh at Bond in Pocahontas. Neumann's pit bulls are out and destroying stuff at Adam Evans' mom house. They can be shot because they are mean." (Clark dep., at 15; Feazel Dep. Ex. 5).

Lantrip's boss Feazel ordered the execution of Plaintiff's dog, maybe because Feazel didn't like Plaintiff, maybe because he didn't like Plaintiff's derby performance, maybe because of some other reason. Regardless of the reason, this is the very definition of an unconstitutional act caused by a person with municipal policy making authority.

## VI.  STATE LAW IMMUNITY

Defendants argue that they all are entitled to immunity from Plaintiff's Illinois causes of action due to statutory immunity. They accordingly ask for summary judgment as to the conversion and *respondeat superior* causes of action stated in the First Amended Complaint, and the statutory cause of action under the Humane Care for Animals Act. Like their others, this basis for Defendants' Motion for Summary Judgment lacks merit.

Defendants first cite section 2-202 of the Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/2-202, and claim that Michael Lantrip's actions were not willful and wanton, and therefore the statutory immunity applies to him and to all who are also liable as a result of his actions. (Memorandum in Support, at 10 – 11). They argue that immunity applies unless Lantrip's actions showed "an actual or deliberate intent to cause harm, or which, if not intentional, shows an utter indifference or conscious disregard for the safety of others or their property," citing 745 ILCS 10/1-210 (defining "willful and wanton conduct") (Memorandum in Support, at 11).

Contrary to Defendants' spin, the actual evidence in this case shows that Lantrip deliberately intended to harm Plaintiff's dog – in fact, he intended to, and did, kill Ruger (two shots, both to the head). This was done with utter indifference to and conscious disregard to Plaintiff's rights and to Plaintiff's property. The immunity of Section 2-202 is far out of Defendants' grasp here.

Confusingly, Defendants next rely on Section 2-201 of the Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/2-202, claiming that Lantrip is entitled to <u>absolute</u> immunity as one "serving in a position involving the determination of policy or the exercise of discretion," and who is accordingly "not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though

abused." Defendants argue at length that, because Lantrip was called upon to exercise "discretion" in performing his dog catcher duties, the statutory absolute immunity applies to him.

It is unclear why Defendants believe this latter immunity has any applicability here. This immunity is available only for acts which involve <u>both</u> the determination of policy and the exercise of discretion. <u>Spangenberg v. Verner</u>, 321 Ill. App. 3d 429, 434-35 (5th Dist. 2001); <u>Harrison v. Hardin County Comm. Unit Sch. Dist. No. 1</u>, 313 Ill. App. 3d 702 (5th Dist. 2000); <u>Torres v. City of Chicago</u>, 123 F. Supp. 2d 1130, 1133 -34 (N.D. Ill. 2000). Here even if Lantrip's actions could be characterized as discretionary (which they cannot – he was performing duties assigned to him by the city; the only discretion he exercised was personal discretion in how and in what order to perform the required tasks), Defendants do not even try to argue that he was a policy maker – clearly he was not, but instead he answered to the police chief, the mayor, the Village board member responsible for police matters, and finally to the entire Village board. This claim to immunity is utterly meritless.

Finally, without any support or analysis, Defendants also make the bald claim that the Humane Care for Animals Act does not apply to a governmental official "who, in the course of his employment, shoots a threatening dog." (Memorandum in Support, at 12). Defendants purport to support this bald assertion with discussion of the Humane Care for Animals Act, but they completely fail to cite any section or specific provision of that statute that would add credibility to their thesis. Nor do they cite a single case. This argument should be disregarded for this reason alone. Additionally, though, the argument does lack merit when the actual authorities are reviewed. The liability under the statute is derived from section 16.3, 510 ILCS 70/16.3, which allows a civil recovery for damages incurred where an animal "is subjected to an act of aggravated cruelty" as defined by section 3.02, 510 ILCS 70/3.02, which in turn provides that

"[n]o person may intentionally commit an act..." which is defined and described by the section of the statute. Finally, section 2.07, 510 ILCS 70/2.07, defines "person" to include: "any individual, minor, firm, corporation, partnership, other business unit, society, association, or other legal entity, any public or private institution, the State of Illinois, or any municipal corporation or political subdivision of the State." The statute not only encompasses the Village of Pocahontas, but also its individual employees, including Michael Lantrip.

It must also be noted that the statutory immunity cited by Defendants is entitled the Local Governmental and Governmental Employees Tort Immunity Act. 745 ILCS 10/1-101 (emphasis added). The Humane Care for Animals Act provides for a specific species of statutory liability, not common law tort liability. The immunity statute does not apply to the Humane Care for Animals Act at all.

## VII. AVAILABILITY OF PUNITIVE DAMAGES

Defendants' final argument is that the Defendants' behavior here does not warrant punitive damages. According to Defendants, "there is absolutely no triable issue of fact as to whether he engaged in conduct worthy of imposition of punitive damages." (Memorandum in Support, at 13). Defendants also reiterate their statutory immunity claim, and add that the Local Governmental and Governmental Employees Tort Immunity Act "overrides any statutory claim for punitive damages." (Memorandum in Support, at 13 – 14 (citing Paulson v. City of DeKalb, 268 Ill. App. 3d 78 (2d Dist. 1994)).

This is another meritless argument. First, the facts available at this time more than amply warrant a determination by the trier of fact as to whether and how much punitive damages may be assessed for the premeditated, meaningless, and unnecessary shooting of Ruger. Second, the immunity claimed by Defendants is unavailable to Lantrip here, for the reasons discussed above.

And third, the statutory immunity against punitive damages discussed in the Paulson case, 745 ILCS 10/2-102, which is apparently the immunity upon which Defendants rely, applies only to "a local public entity," see 745 ILCS 10/1-206, and not generally to any "public employee" as defined by 745 ILCS 10/1-207. The statute does allow limited immunity for "public officials," but only for acts performed "while serving in an official executive, legislative, quasi-legislative or quasi-judicial capacity...." Lantrip was a public employee, not a public official, and this suit does not concern any executive, legislative, or other activity covered by that immunity.

## VIII. CONCLUSION

Plaintiff accordingly requests that this Court enter a summary judgment in his favor, and against Defendants Michael Lantrip and Jane Lantrip for liability as to Count I of the First Amended Complaint; against the Defendant Village of Pocahontas for liability as to Count II of the First Amended Complaint; and as to Defendants Michael Lantrip and Jane Lantrip as to Count VII of the First Amended Complaint, including separate orders of liability upon each of the elements of those causes of action and in Plaintiffs' favor on Defendants' asserted affirmative defenses.

Date: January 19, 2016

Respectfully submitted,

STEVEN NEUMANN, Plaintiff

By:   /s/ Stephen F. Hedinger

Sorling Northrup
Stephen F. Hedinger (#6198999)
Attorneys for Plaintiffs
1 North Old State Capitol Plaza, Suite 200
P.O. Box 5131
Springfield, IL 62705

Telephone:  (217) 544-1144
Facsimile:  (217) 522-3173
E-Mail:  sfhedinger@sorlinglaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2016 I electronically filed the foregoing Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment, with the Clerk of Court using the CM/ECF System which will send notification of such filing to the following:

Charles A. Pierce
Pierce Law Firm
#3 Executive Woods Court, Suite 200
Belleville, IL  62226
cpierce@piercelawpc.com

By:  ____/s/ Stephen F. Hedinger_____

Sorling Northrup
Stephen F. Hedinger, # 6198999
One North Old State Capitol Plaza, Suite 200
P.O. Box 5131
Springfield, IL 62705
Telephone:  (217)544-1144
Facsimile:  (217)522-3173
E-Mail: sfhedinger@sorlinglaw.com